IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                    No. CR-03-0368 MV

STEVEN EDWARD ROOF,

    Defendant.

## MEMORANDUM OPINION

**THIS MATTER** comes before the Court on Defendant Steven Roof's Motion to Suppress Evidence **[Doc. No. 24]**. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, **GRANTED** the motion at the hearing held on August 28, 2003. The Court now sets forth the bases for its prior ruling in this Memorandum Opinion.

## BACKGROUND

On August 7, 2002, United States Marshal's Service Deputies in Albuquerque received information from DEA Officer Frank Chavez that federal fugitive Steven Roof was residing at 5512 Delhi NE in Albuquerque, New Mexico. Officer Chavez had received a tip from an unidentified informant that Roof was always heavily armed, was cooking methamphetamine at that location, and was teaching others how to make methamphetamine. The Government attempted to verify whether Roof in fact lived at that address by checking in whose name utilities were listed, but neither Roof's name nor any of his alleged aliases appeared.

Six months later, on February 7, 2003, at around 8:30pm, Deputies John Olson and Rex Griffith were conducting surveillance of the home. Shortly before 9:00pm, the deputies saw someone briefly step out of the house but could not see clearly enough to identify him. At around

9:00pm, the deputies observed an individual exit the front door, enter the garage, and drive away in a Porsche. At this time, the deputies were able to identify the individual as Steven Roof.

As they began following Roof in their unmarked vehicle, the deputies radioed for backup. Roof approached a retail store, but seeing that it was closed, drove past the entrance and headed back toward 5512 Delhi NE. The deputies continued to follow Roof, who stopped his car as he entered the Delhi NE neighborhood. Fearing they might be discovered, the deputies continued past the neighborhood, but then made a U-turn and drove by 5512 Delhi NE. The deputies could not tell whether Roof had returned home since the garage door was closed and no individuals could be observed from outside.

Once backup officers arrived, the deputies established a perimeter around 5512 Delhi NE. Before the officers could take action, a pickup truck pulled into the driveway at around 11:30pm. Deputy Griffith, who was positioned diagonally across the street from the home with Deputy Lee Boman, could not tell how many people were in the truck, who or how many emerged from the vehicle in the driveway, or any of the activity in the driveway. Supervising Deputy Tom Bauman then made the decision to enter the home to arrest Roof. Deputies Kent Halverson and Olson went to the back of the house, Deputies Boman and Griffith approached the front door, and Deputies Bauman, Corey Thomas and two Albuquerque police officers neared the front of the home from the garage-side. Deputy Bauman then instructed Olson to call a number believed to be listed for the home, but no one answered the phone and no ringing was heard from within 5512 Delhi NE.

Meanwhile, Deputies Halverson and Olson had been approaching from the back of the home. Halverson could see indistinguishable shadows pass by the back door and the flickering

light of what he could tell was a television, but not much more because the curtains or blinds were drawn and it was dark out. The deputies at the front door knocked and announced that they had a warrant. Nothing happened at the front of the home, although the officers could hear some movement or shuffling inside. Halverson, still at the rear, then observed a man step out of the back door, who he identified as Roof when Deputy Olson shined a flashlight on the man. Halverson shouted commands ordering Roof to get down, but Roof retreated into the home through the same back door. At the same time, the officers at the front door heard radio communication and some officers yelling in the back yard, essentially shouting orders to freeze. About a minute or so later, the front door opened and a young adult exited, followed by Defendant Roof. The two men complied with orders to lie on the ground and were handcuffed by two deputies without incident.

    Deputy Bauman then decided to conduct a protective sweep of the home and entered through the front door, followed by Deputy Thomas and two Albuquerque police officers. Inside, the officers found in plain view what appeared to be narcotics and two weapons. After sweeping the house for other people and having found no one, the officers exited through the front door. Deputy Bauman next entered the detached garage, the entrance to which was directly opposite the front entrance to the house. After opening the door, Bauman detected a strong chemical order, conducted a quick sweep inside the garage to check for others who may have been hiding in the garage, and left after finding no one.

    The deputies then called DEA officials who obtained a search warrant based on the officers' observations during the protective sweep. Later, agents with the DEA Clandestine

Laboratory Enforcement Team searched the house pursuant to the warrant, seizing numerous items, including material used to manufacture methamphetamine.

Defendant made a motion to suppress all evidence, tangible or intangible, as well as all statements or admissions made around the time of his arrest, arguing that the information used to obtain the DEA search warrant was acquired through an unlawful sweep of his home. Defendant argued the sweep was unconstitutional specifically because (a) the officers had no information that would lead them to believe that there were others in the home or that the home contained any other source of danger, and (b) in the alternate, the officers exceeded what is permissible in a protective "sweep" as they looked into places where no person could hide (e.g., drawers and envelopes) and entered into the detached, locked garage.

## DISCUSSION

The Tenth Circuit has held that, where an arrest is effectuated outside a home, "[d]epending on the circumstances, the exigencies of a situation may make it reasonable for officers to enter [the] home without a warrant in order to conduct a protective sweep." *United States v. Cavely*, 318 F.3d 987, 995 (10th Cir. 2003) (citations omitted). "A protective sweep is not a full search, but rather a quick, cursory inspection of the premises, permitted when police officers reasonably believe, based on specific and articulable facts, that the area to be swept harbors an individual posing danger to those on the arrest scene." *United States v. Hogan*, 38 F.3d 1148, 1149 (10th Cir. 1994) (quoting *United States v. Soria,* 959 F.2d 855, 857 (10th Cir. 1992)). Accordingly, the scope of such a sweep is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). As for duration, a protective sweep should "last[] no longer than is necessary to

dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36.

In the present case, the Government argued the sweeps of the home and the garage were supported by the arresting officers' reasonable and articulable belief that there might be other armed individuals in the home who posed a safety threat. The bases for that belief were the informant's tip that had been conveyed to the Marshal's Deputies by Agent Chavez six months prior to the arrest and the officers' observations on the evening of the arrest itself. However, after hearing the testimony of the officers and Defendant, this Court concluded that the officers did not have adequate grounds to justify a warrantless sweep of the home, given the legal standards surrounding a protective sweep.

As for the informant's tip, the Court first notes that it was six months old at the time of the arrest and that it had not been corroborated during that intervening period. In *Hogan*, the Tenth Circuit concluded that the investigating officers' reasons for conducting a warrantless protective sweep of the defendant's home, after defendant had been arrested outside, were insufficient partly because, although the officers had evidence that an accomplice had been involved in the murder for which defendant had been arrested, the murder had taken place a month earlier and "[t]here was no indication that the officers were in danger from a hidden accomplice *on that day*." *Hogan,* 38 F.3d at 1150 (emphasis added). In the case at bar, the informant's tip was much older than one month and, in addition, lay uncorroborated after six months of surveillance. Deputy Thomas testified that, although no records were kept, he personally conducted surveillance of the home - either by simply driving past the house or by standing watch for thirty minutes or so - fifteen or twenty times, but never saw anyone matching

Roof's description. In fact, Deputy Griffith testified that he was surprised to see Roof exit the home and drive away early in the evening on the night of the arrest precisely because "[n]ever before had anybody seen any kind of activity, or the defendant show his face there." *Trans.* at 57. When Deputy Thomas ran license plates checks on vehicles parked outside the house in the six months before February 7, 2003, neither Roof's name nor any of his alleged aliases appeared. Utilities were registered in another person's name. No officer ever acquired any information during the six-month period that substantiated the informant's tip even remotely.

While the deputies' reasons for conducting the sweeps rested on this tip as well as the surveillance from the night of the arrest, the Court found that the observations from that evening did not provide "specific and articulable" facts for believing officer safety was at issue. Although the affidavit submitted in support of the search warrant stated that Deputies Boman and Griffith had observed at least one male enter the residence after the pickup truck had arrived, Griffith testified that he had not seen anyone enter the home. *Trans.* at 82. Moreover, Deputy Griffith testified that he was unable to see the occupant or occupants of the vehicle or, once the truck parked in the driveway, any activity in the walkway. *Trans.* at 67. No officer testified as to hearing voices or other sounds that would give them reason to believe that more than one person had exited the truck or enter the home. Although supervising Deputy Bauman stated that Griffith had informed him that an unknown number of people had entered the house once the truck arrived, *Trans.* at 127, Deputy Griffith testified on cross-examination that he had not provided *any* information to Bauman, *Trans.* at 74-75.

Immediately after the arrest and while Defendant Roof and his companion were secured on the ground outside, officers testified that they could see lights on or hear voices and noises

coming from inside the house, giving them added grounds for conducting the sweep of the house. While Deputy Halverson, who was situated at the rear of the home, stated that he saw a flickering light inside and understood it to be a television, Deputy Bauman, who was standing by the front door, stated that he could not tell what the source of the sounds he was hearing were. However, if, as the testifying officers stated, the front door was ajar after the arrest, the officers should have been able to distinguish between the sounds of people talking or rustling about and the sounds that emanate from a television, particularly because any light or sound coming from the 36-inch television set would have been plainly visible or audible: the television sat near the front entryway, with the side panel immediately visible by anyone standing in the open doorway.

The decision to conduct the subsequent protective sweep of the garage was equally lacking in foundation. Deputy Bauman testified that entry was made into that area because of "the unknown," because it was "still an unsecure area," because the officers did not "know if anybody [was] in there, or who could [have been] in there." *Trans.* at 122. In other words, the officers had no actual reason to suspect that someone was in the garage or that the garage housed some source of danger to the officers. The protective sweep of that area was conducted because "[i]t was an area of the house that [the officers] had not looked in yet for personnel." *Trans.* at 125.

In sum, the officers had no affirmative, articulable evidence suggesting that there was anyone else in the house or detached garage or that those areas held some source of danger. Throughout the testimony, the officers' main concern appears to have been the *possibility* that others were inside. At most, Deputy Bauman stated that based on the information he had received, he could not tell "if one person [had] got[ten] out of the truck" or "if two or three

people [had] got[ten] out of the truck." *Trans.* at 134. Quite simply, the officers "did not know how many people went from the truck into the residence." *Trans.* at 134. While Deputy Bauman recalled getting information over the radio that doors, plural, had been heard closing after the truck parked in the driveway, no other officer, including Deputy Griffith who Bauman believed had made that statement, testified that he heard any sound of more than one person exiting the truck. Speculation, however, is not "specific and articulable" fact. *See, e.g., United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996) ("Lack of information cannot provide an articulable basis upon which to justify a protective sweep."). The deputies seem to defend their actions on the grounds that they had no evidence showing that no one else was at the home. Yet if this was the relevant legal inquiry, a protective sweep would almost always be upheld because there will always be the possibility that someone else is in the area to be searched. Such a legal standard would also have the undesirable impact of encouraging officers to feign ignorance since a sweep would be upheld in the face of the "unknown."

Prior case law has made clear that a "protective sweep is 'appropriate *only* where officers *reasonably perceive an immediate danger* to their safety.'" *Hogan*, 38 F.3d at 1150 (quoting *United States v. Owens,* 782 F.2d 146, 151 (10th Cir. 1986)) (emphasis added). In *United States v. Cavely*, 318 F.3d 987 (10th Cir. 2003), the Tenth Circuit upheld a protective sweep of defendant's home, even though he had been arrested outside, because the investigating officers knew that firearms had been found on the premises during a prior search, they had clear indication that methamphetamine was being manufactured when they arrested the defendant outside his home (he was just seen carrying chemicals involved in making the drug), and the defendant himself stated, after his arrest, that someone else was in the home. In other words, in *Cavely*,

"[t]he evidence showed specific facts that would warrant a reasonable officer to believe that appellant's home harbored an individual posing a danger to the officers or others on the arrest scene." *Id.* at 996.  By contrast, the evidence presented to the Court did not show that the deputies possessed any actual information reasonably suggesting that the house or someone in it posed an immediate threat to their safety.

**IT IS THEREFORE ORDERED** that Defendant Steven Roof's Motion to Suppress Evidence **[Doc. No. 24]** is hereby **GRANTED**.  All evidence seized as a result of the unlawful protective sweeps of the house and the garage will be suppressed.

Dated this 18th day of September, 2003.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE

Attorney for Plaintiff:
Elaine Y Ramirez

Attorney for Defendant:
Paul J. Kennedy